UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/25/2023
```

JASON ANTONIO REECE,

            Plaintiff,

    -against-

KILOLO KIJAKAZI, Acting Commissioner
of Social Security,

            Defendant.

22-CV-674 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Jason Antonio Reece filed this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying his application for Supplemental Security Income (SSI). Now before me are the parties' cross-motions for judgment on the pleadings. (Dkts. 21, 24.) For the reasons that follow, plaintiff's motion (Dkt. 21) will be granted, the Commissioner's motion (Dkt. 24) will be denied, and this action will be remanded to the Commissioner for further proceedings.

## I.    BACKGROUND

Plaintiff was born in the Bronx, New York, on July 10, 1981. *See* Certified Administrative Record (Dkt. 16) (hereinafter "R. __") at 89, 191, 214, 292. He was incarcerated for the first time at age 12 (R. 292, 312, 1087), and thereafter throughout much of the following decades. (R. 315.) He was released from prison in July 2019, at age 38, after serving a 10-year sentence for weapons possession. (R. 296, 315.)

Plaintiff applied for SSI on August 30, 2019 (R. 89, 214), alleging disability since July 30, 2019. (R. 76, 214.) The Social Security Administration (SSA) denied plaintiff's claim initially on December 3, 2019 (R. 89), and again, on reconsideration, on June 10, 2020. (R. 113.) On November 18, 2020, plaintiff and his counsel appeared by telephone before Administrative Law

Judge (ALJ) John Carlton (R. 30), who took testimony from plaintiff (R. 37-58) and from Vocational Expert (VE) Joseph Atkinson. (R. 58-62.) On May 19, 2021, the ALJ issued a written decision (Decision) (R. 10-24), concluding that plaintiff was not disabled within the meaning of the Act. On November 30, 2021, the Appeals Council denied review (R. 1-3), rendering the ALJ's determination final.

This action followed. Plaintiff filed his motion for judgment on the pleadings on December 12, 2022 (Dkt. 21), accompanied by a memorandum of law (Pl. Mem.) (Dkt. 22). The Commissioner filed her cross-motion on February 10, 2023 (Dkt. 24), accompanied by a memorandum of law (Def. Mem.) (Dkt. 25). Plaintiff filed a reply memorandum (Pl. Reply Mem.) (Dkt. 27) on February 23, 2023.[1]

## II.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Treating Providers

During the relevant period, plaintiff was treated at the Federal Bureau of Prisons (FBP); Tri Center, Inc. (Tri Center), where he received outpatient mental health care as part of his post-release community treatment services; Bridgeport Hospital, where he was hospitalized with COVID-19 and visited the Emergency Department; The Hub Health Center (The Hub), where he received medical care; Dr. Ferdinand J. Chan, M.D., who assessed his knee; Recovery Network of Programs, Inc. (Recovery Network), where he received a mental health assessment; and CT Renaissance, Inc. (CT Renaissance), where he was assessed and then participated in outpatient mental health therapy. Because plaintiff's challenge to the Commissioner's determination is based

---

[1] Both of plaintiff's briefs cite numerous district courts opinions only by their docket numbers and dates, although the same cases are available on Westlaw and/or Lexis. In some instances, significant subsequent history was omitted. The Court is not unsympathetic to the time pressures experienced by busy practitioners, but reminds counsel that citation errors of this nature impose inappropriate burdens on the Court and can delay the resolution of pending motions.

primarily on his psychiatric impairments, the following summary focuses on plaintiff's mental health treatment and evaluations.

### 1.   FBP

On September 27, 2018, an MRI of plaintiff's left knee revealed a chronic degenerative tear of the anterior cruciate ligament (ACL); significant osteoarthritis; and knee joint effusion with moderate synovitis. (R. 300.) On May 16, 2019, plaintiff was seen by Dr. Rex Cooley, D.O., complaining of pain in his left knee and asking about options for surgery. (R. 296-97.) Plaintiff reported that his condition was "quite painful" and was accompanied by swelling, and that the knee "lock[ed] up on him periodically." (R. 296.) Plaintiff had an antalgic gait, and an examination of his left knee revealed a positive McMurray's test, a slight effusion, and a limited range of motion. (*Id.*) Plaintiff was "cooperative with normal mood, affect, and cognition." (*Id.*) Dr. Cooley assessed a chronic rupture of the left ACL but recommended that, since plaintiff was soon to be released, he have surgery "as a citizen." (R. 297.)

### 2.   Tri Center

On July 29, 2019, Kwame Okyere-Amofah, N.P., completed a psychiatric evaluation of plaintiff at Tri Center. (R. 291-93, 1095-99.) Plaintiff presented as "morbidly obese and ambulates with a cane." (R. 292.) He reported insomnia, "with average night sleep of 2-3 hours," as well as "racing thoughts and spiral thinking." (*Id.*) On examination, plaintiff was "calm with no sign of aggression," and his cognitive function was "intact," but his mood was "sad [and] confused." (R. 291.) Plaintiff had "poor insight into his condition," "fluctuating energy levels, insomnia for days and hallucination/persecutory thoughts." (*Id.*) Mr. Okyere-Amofah diagnosed plaintiff with

schizoaffective disorder, bipolar type, and post-traumatic stress disorder (PTSD), and started plaintiff on Abilify and Lamictal. (*Id.*)[2]

On August 7, 2019, Tri Center conducted a comprehensive assessment of plaintiff's mental health for the New York State Office of Mental Health (R. 307-19), and assessed him with symptoms of bipolar disorder, depression, and mania, which had gone untreated "for some time." (R. 315.) Plaintiff was "oriented x3," appropriately groomed, but "morbidly obese." (R. 316.) He had a full affect, but his speech was "slightly pressured" and at times he lost focus during the conversation and evidenced "irritable behavior." (*Id.*) He had poor insight, "particularly relating to his mental health condition." (*Id.*) He reported a "low mood" (*id.*), and past suicide attempts, but no current suicidal ideation. (R. 316.) Plaintiff noted that he had been involved in physical fights and verbal altercations while incarcerated, "due to difficulty managing anger." (R. 317.) His diagnoses were PTSD and "schizoaffective-bipolar type." (R. 318.)

On October 14, 2019, Skye Hillier, L.M.S.W., completed a "termination report" for plaintiff's mental health treatment at Tri Center. (R. 1100-02.) She reported his diagnoses of PTSD and schizoaffective disorder-bipolar type. (R. 1100.) Plaintiff was still taking Abilify and Lamictal. (*Id.*) Ms. Hillier assessed plaintiff's prognosis as "guarded." (R. 1102.) He was attentive and engaged in treatment but was "in early stages of addressing insight and skill necessary for effectively managing his [mental health] independently." (*Id.*)

On October 24, 2019, plaintiff was evaluated by Mary Asiedu, N.P., at Tri Center. (R. 1078-79.) On examination, his mood was only "fair," but he was calm and cooperative, with good

---

[2] Abilify (a brand name for aripiprazole) is an antipsychotic used to treat schizophrenia and manic episodes. MedlinePlus, *Aripiprazole*, https://medlineplus.gov/druginfo/meds/a603012.html (all websites last visited Sept. 25, 2023). Lamictal (a brand name for lamotrigine) is a mood stabilizer used to treat, among other conditions, bipolar disorder. MedlinePlus, *Lamotrigine*, https://medlineplus.gov/druginfo/meds/a695007.html.

eye contact; he was neatly groomed; and his speech, thought process, and thought content were normal. (R. 1078.) His affect was reactive, and he had good insight, but only fair judgment. (R. 1079.) Plaintiff reported a long history of auditory hallucinations, "although it is not as frequent as it was in the past." (*Id.*) He also described chronic insomnia ("no more than 3 hours of sleep"), mood swings, irritability, and feeling paranoid. (*Id.*) Ms. Asiedu noted that plaintiff was responding well to Abilify, which helped decrease his irritability and auditory hallucinations, but that his insomnia persisted. (*Id.*) She recommended that his dosage of Abilify be increased. (*Id.*)

### 3.    The Hub

Plaintiff received treatment at The Hub on August 27, 2019 (R. 997-1001), October 21, 2019 (R. 991-95), November 4, 2019 (R. 989-90), December 2, 2019 (R. 986-87), January 7, 2020 (R. 981-84), and on April 15, 2020 (R. 978-79.) Sannitta Giwah, F.N.P., examined plaintiff during his initial visit on August 27, 2019, and noted that he was taking various medications for his physical impairments (including ibuprofen for pain, and fluticasone and albuterol for asthma), but was not taking Lamictal. (R. 997.) After a physical examination, Ms. Giwah assessed plaintiff with an elevated body mass index of 45.0-49.9, indicating obesity, and folliculitis. (R. 999.)

On December 2, 2019, plaintiff was examined by Nicketta McPherson, P.A., who assessed plaintiff with acquired hypothyroidism, a rupture of the ACL of his left knee, and seasonal allergic rhinitis. (R. 986.) Ms. Giwah saw plaintiff again on April 15, 2020, and assessed mild intermittent asthma, without complication, and hypothyroidism. (R. 979.) During a January 7, 2020 exam, Ms. Giwah assessed left knee pain (for which she recommended ibuprofen), mild intermittent asthma, acquired hypothyroidism, and PTSD. (R. 982.)

### 4.    Dr. Chan

Dr. Chan saw plaintiff on November 22, 2019, due to his worsening knee pain. (R. 332-37.) On the Lachman test, Dr. Chan rated plaintiff's left knee 2B, meaning that the knee was

unstable and likely to give way with activity. (R. 334.) Dr. Chan assessed plaintiff with morbid obesity and a left knee ACL tear and medial meniscus tear, and recommended reconstructive surgery. (R. 333, 336.) An X-ray of the left knee taken that date revealed medial joint space narrowing and a varus deformity of the proximal tibia. (R. 369.)

Dr. Chan saw plaintiff again on November 25, 2019, with similar findings, except that he rated the left knee as "Lachman: 2A." (R. 348.) Plaintiff reported that his knee was injured in 2018, when prison guards twisted his knee while subduing him. (R. 347.) After discussing operative and non-operative options, plaintiff opted for "surgical management of the meniscus." (R. 350.) However, he did not proceed with surgery at that time because of his obesity. (R. 50-51.)

### 5. Bridgeport Hospital

On January 5, 2020, plaintiff went to the Emergency Department at Bridgeport Hospital due to pain and swelling in his legs, feet, and ankle. (R. 692-719.) After triage, the Emergency Department ordered an X-ray, but plaintiff did not respond when called, and they were unable to locate him to conduct further tests. (R. 445.) From March 26, 2020 through April 10, 2020, plaintiff was hospitalized for COVID-19 at Bridgeport Hospital. (R. 377.) On September 21, 2020, and again on September 27, 2020, plaintiff was treated in the Bridgeport Hospital ED for asthma exacerbations. (R. 1114-50, 1150-77.)

### 6. Recovery Network

On March 4, 2020, plaintiff underwent a psychiatric evaluation at Recovery Network, conducted by Christine Rowland, P.A.-C. (R. 371-75.) Plaintiff's chief complaint was that his mood was "up and down." (R. 371.) He was cooperative during the evaluation and his mental status exam was unremarkable. (R. 375.) He reported non-command auditory hallucinations "which are not bothersome," and denied suicidal ideation, plan, or intent. (R. 371.) Plaintiff reported he was taking a diuretic, thyroid medication, albuterol, and Abilify. (R. 372.) He told Ms.

Rowland that he missed doses of his thyroid medication (levothyroxine) because he could not "get up early enough to take them." (R. 371.) Ms. Rowland recommended an increased dose of Abilify to better manage plaintiff's auditory hallucinations. (R. 375.)

### 7.    CT Renaissance

Cassandra Ruela, L.P.C., evaluated plaintiff at CT Renaissance on July 21, 2020. (R. 1016-30.) Plaintiff reported that he spent most of his time alone (R. 1017) and that in the past 30 days, he had experienced serious depression, serious anxiety or tension, hallucinations, and trouble with concentration, understanding, and remembering. (R. 1022.) He stated that he was looking for work. (R. 1028.) Ms. Ruela diagnosed schizoaffective disorder, bipolar type, PTSD, and moderate cannabis use disorder. (R. 1029.)

On August 11, 2020, Robert Guerrera, M.D., conducted a psychiatric evaluation of plaintiff. (R. 1031-35.) Plaintiff was casually dressed and neatly groomed; was calm, cooperative, and had good eye contact; spoke with a normal rate, tone, volume, latency, and articulation of verbal process; had linear thought content; but had a constricted affect. (R. 1033.) Plaintiff's attention span and concentration were intact, his memory was grossly intact, and he was fully oriented. (*Id.*) Dr. Guerrera found plaintiff's insight to be fair and his judgment to be good. (*Id.*) Plaintiff reported an "up and down" mood and endorsed "fair sleep, auditory and visual hallucinations and paranoid ideations," though he denied suicidal or homicidal ideation, and reported experiencing recurrent flashbacks, increased startle response, hypervigilance, paranoia, and nightmares due to his past trauma. (*Id.*) His auditory hallucinations were "commentary and command in nature." (R. 1034.) Dr. Guerrera diagnosed schizoaffective disorder, bipolar type,

PTSD, and moderate cannabis use. (*Id.*) He then prescribed plaintiff aripiprazole for mood stabilization, and prazosin and hydroxyzine for his PTSD. (*Id.*)[3]

Plaintiff attended group therapy at CT Renaissance on July 31, 2020 (R. 1037), August 7, 2020 (R. 1038), August 14, 2020 (R. 1041), and August 21, 2020. (R. 1044.) During these sessions, he was on time, participated, and was engaged. (*See* R. 1037-38, 1041, 1044.)

Dr. Guerrera saw plaintiff again on August 25, 2020. (R. 1045-51.) Plaintiff felt "a little better" since restarting his medications two weeks prior, but was only sleeping two hours per night. (R. 1045.) On exam, he was alert and cooperative, and his rate, tone, volume, latency of speech, and articulation were normal. (R. 1047-48.) Although his mood was sad, he was oriented to person, time, and place, and his memory and concentration were intact. (R. 1048.) His thought process was linear and logical, his insight was fair, and his judgment was good. (R. 1048-49.)

### B.    Consultative Medical Examiner Dr. Nickens

On November 18, 2019, Saundra Nickens, M.D., conducted a consultative medical examination of plaintiff at the request of the SSA. (R. 321-24.) Plaintiff's chief complaint was his left knee pain, which he rated at 8.5 out of 10 that day. (R. 321.) At the time of the exam, plaintiff was taking Abilify, Lamictal, ibuprofen, levothyroxine, mometasone (a topical steroid), and albuterol by inhaler, all daily. (*Id.*)

During the exam, plaintiff reported that he was living with a cousin, who did the cooking, cleaning, laundry, and shopping. (R. 322.) Plaintiff could shower, bathe, and dress himself. (*Id.*) His primary activity was listening to the radio. (*Id.*) Plaintiff ambulated with a cane and reported

---

[3] Prazosin is an alpha-blocker which is also used to treat sleep problems associated with PTSD. Medline Plus, *Prazosin*, https://medlineplus.gov/druginfo/meds/a682245.html. Hydroxyzine is an antihistamine which is also used "to relieve anxiety and tension." Medline Plus, *Hydroxyzine*, https://medlineplus.gov/druginfo/meds/a682866.html.

that he could not walk without it. (*Id.*) Dr. Nickens agreed that the cane was medically necessary. (*Id.*) Plaintiff's physical exam was unremarkable except for his weight and his left knee. (R. 322-24.) Plaintiff declined squatting, fearing it would be unsafe (R. 322), and declined the straight-leg raising test, as well as strength evaluation of the left knee, due to his knee pain. (R. 323.) Based on observation, Dr. Nickens estimated his left knee strength was at least 3-/5. (*Id.*)

Dr. Nickens diagnosed plaintiff with morbid obesity and "[r]eported left knee internal derangement/pain," and opined that, although plaintiff's lack of cooperation hampered the evaluation of his left knee, he had "at least moderate limitations with activities requiring stooping, bending, crouching, prolonged standing, prolonged walking, and negotiating stairs due to left knee pain with a contributory mechanical pain as a result of his morbid obesity." (R. 324.)

### C.   Consultative Psychiatric Examiner Dr. Fiskus

Also on November 18, 2019, Jonathan Fiskus, Psy.D., conducted a consultative psychiatric examination of plaintiff at the request of the SSA. (R. 326-30.) Plaintiff reported completing school through the ninth grade, in special education, with a diagnosis of ADHD. (R. 326.) Currently, plaintiff reported difficulty both falling and staying asleep due to "his mind racing," mood fluctuations with some depressive symptoms, including crying spells, diminished self-esteem, and social withdrawal. (R. 326-27.) He had discomfort with crowds, due to "flashbacks and nightmares" about his prison time. (R. 327.) He also reported manic periods, during which his mood improved and he became more talkative, with inflated self-esteem and "flight of ideas." (*Id.*)

Plaintiff reported a history of "extensive auditory hallucinations." (R. 327.) His current hallucinations included "a voice that is cracking jokes and telling him to stay away from people." (*Id.*) Plaintiff denied suicidal or homicidal ideation, but exhibited paranoid ideation, in that "he feels like sometimes someone is after him or out to get him." (*Id.*) He also reported "some short-

term memory deficits, long-term memory deficits, and difficulty learning new material as well as concentration difficulties." (*Id.*)

During the mental status examination, plaintiff was cooperative and had an adequate manner of relating, social skills, and overall presentation. (R. 328.) He appeared well-groomed and his mode of dress was appropriate. (*Id.*) His posture, motor behavior, and eye contact were "normal and appropriate." (*Id.*) His expressive and receptive language were "adequate," while his thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (*Id.*) His affect, however, was depressed and agitated, while his mood was "neutral." (*Id.*)

Plaintiff was oriented to person, place, and time; his attention and concentration were intact; and he was able to count and do simple calculations, though he could not do serial 3s. (R. 328.) As for his recent and remote memory skills, plaintiff was able to remember three out of three objects immediately, two out of three objects after a delay, and five digits forward and three digits backward. (*Id.*) Dr. Fiskus found plaintiff's insight good but his judgment poor. (*Id.*)

Regarding his mode of living, plaintiff reported that he was able to dress, bathe, and groom himself, and clean, launder, and shop, but did not cook. (R. 327.) He managed his own money, but did not drive. (R. 329.) He could take public transportation, but had difficulties because of his knee injury. (*Id.*) Plaintiff reported that he did not socialize much, but had relationships with his aunt and cousin. (*Id.*)

Dr. Fiskus found that plaintiff had marked limitations in regulating emotions, controlling behavior, and maintaining well-being; moderate limitations in interacting adequately with supervisors, co-workers, and the public; and mild limitations in understanding, remembering, and applying complex directions and instructions, using reason and judgment to make work-related

decisions; sustaining an ordinary routine and regular attendance at work; and being aware of normal hazards and taking appropriate precautions. (R. 329.) In Dr. Fiskus's view, plaintiff had no limitations in understanding, remembering, and applying simple directions and instructions; sustaining concentration and performing a task at a consistent pace; or maintaining personal hygiene and appropriate attire. (*Id.*) Dr. Fiskus assessed plaintiff's difficulties as caused by emotional dysregulation, and wrote that the examination results were "consistent with psychiatric problems," and that "this may significantly interfere with the claimant's ability to function on a daily basis." (*Id.*)

Dr. Fiskus listed plaintiff's diagnoses as bipolar II disorder with psychotic features and PTSD; assessed that the expected duration of plaintiff's impairment would be more than a year; and gave a guarded prognosis, "given he continues with treatment." (R. 330.) Although plaintiff reported that he managed his own funds, Dr. Fiskus found that he would "not be able to manage his own funds due to history of arrests including gun possession and selling drugs." (*Id.*)

D.    **State Agency Medical Reviewers**

On November 22, 2019, state agency reviewer S. Padmaraju, M.D., reviewed plaintiff's medical records, including Dr. Nickens' report. (R. 82-84.) Dr. Padmaraju opined that plaintiff could lift 10 pounds occasionally; could lift less than 10 pounds frequently; could stand and/or walk, with normal breaks, for a total of two hours; could sit, with normal breaks, for a total of about six hours in an eight-hour workday; could push or pull an unlimited amount; and would need a medically-required hand-held assistive device for ambulation. (R. 82.) As for postural limitations, Dr. Padmaraju opined that plaintiff could climb ramps/stairs occasionally but could never climb ladders, ropes, or scaffolds; and could occasionally balance, stoop, kneel, crouch, and crawl. (R. 82-83.) Plaintiff would also need to avoid concentrated exposure to fumes, odors, dusts,

gases, and poor ventilation because of his asthma, and hazards like machinery and heights due to loss of strength in his left leg and the use of a cane. (R. 83.)

On June 9, 2020, state agency medical reviewer A. Vinluan, M.D., assessed plaintiff's physical residual functional capacity (RFC) on reconsideration, and came to the same conclusions as Dr. Padmaraju. (R. 97-100.)

### E.    State Agency Psychiatric Reviewers

On December 3, 2019, state agency psychiatric reviewer L. Blackwell, Ph.D., reviewed plaintiff's mental health records, including Dr. Fiskus's report. (R. 80.) Dr. Blackwell evaluated plaintiff's mental impairments using the psychiatric review technique (PRT) mandated by 20 C.F.R. § 416.920a.[4] Dr. Blackwell opined that plaintiff had mild limitations in understanding, remembering, and applying information; moderate limitations in interacting with others; moderate limitations in concentration, persistence, and maintaining pace; and moderate limitations in adapting and managing himself. (R. 80) Dr. Blackwell then assessed plaintiff's mental RFC, opining that he was "capable of engaging in the basic mental activities required in unskilled work." (R. 86.) As part of his RFC analysis, Dr. Blackwell found that plaintiff was moderately limited in

---

[4] The PRT requires the Commissioner to "rate the degree of [the claimant's] functional limitation based on the extent to which [his] impairment(s) interferes with [his] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2). The degree of functional limitation is rated in "four broad functional areas," including the claimant's ability to: (i) "[u]nderstand, remember, or apply information"; (ii) "interact with others"; (iii) "concentrate, persist, or maintain pace"; and (iv) "adapt or manage [him]self." *Id.* § 416.920a(c)(3). The degree of limitation in each area is rated on a five-point scale: "None, mild, moderate, marked, and extreme." *Id.* § 416.920a(c)(4).

"Understand, remember, or apply information" refers to "the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00(E)(1). "Interact with others" refers to "the abilities to relate to and work with supervisors, co-workers, and the public." *Id.* § 12.00(E)(2). "Concentrate, persist, or maintain pace" refers to "the abilities to focus attention on work activities and stay on task at a sustained rate." *Id.* § 12.00(E)(3). "Adapt or manage oneself" refers to "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." *Id.* § 12.00(E)(4).

several subcategories, including the "ability to understand and remember detailed instructions," the "ability to carry out detailed instructions," the "ability to maintain attention and concentration for extended periods," the "ability to work in coordination with or in proximity to others without being distracted by them," the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," the "ability to interact appropriately with the general public," the "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," the "ability to respond appropriately to changes in the work setting," and the "ability to set realistic goals or make plans independently of others." (R. 84-86.) Otherwise, Dr. Blackwell found, plaintiff was "[n]ot significantly limited." (*Id.*)

On May 29, 2020, state agency psychiatric reviewer A. Chapman, Psy.D., assessed plaintiff's mental RFC on reconsideration, and came to the same ultimate conclusion: that plaintiff was "capable of engaging in the basic mental activities required in unskilled work." (R. 102.) As part of his RFC analysis, Dr. Chapman found that plaintiff was moderately limited in the "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance," the "ability to work in coordination with or in proximity to others without being distracted by them," the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," the "ability to interact appropriately with the general public," the "ability to accept instructions and respond appropriately to criticism from supervisors," and the "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (R.100-02.) Otherwise, Dr. Chapman found, plaintiff was "[n]ot significantly limited." (*Id.*)

III.    **THE HEARING**

A.      **Plaintiff's Testimony**

During his telephonic hearing before ALJ Carlton, plaintiff – then 39 years old – confirmed that he was not currently working. (R. 37.) Initially, he said that the last time he held a job was "in the penitentiary." (*Id.*) However, when probed by the ALJ (based on a treatment note from CT Renaissance), plaintiff acknowledged that since his release from prison he had worked at a barbershop, "just filling in for someone," part time and off the books. (R. 37-38.)[5] He did this for about four to six months, "maybe before COVID, or probably in between the COVID time." (R. 38-39.) Plaintiff stated that he was not paid for "barbering," but only for "odd jobs like sweeping and things like that," for which he was paid "like $50.00 [at] the most," per month. (R. 39-41.) Although he was at the barbershop from 8:00 a.m. to 8:00 p.m., about three days per week, he "was barely [] doing anything," because any time he moved around too much, his knee would "act up." (R. 40.)

When asked why he was unable to work, plaintiff testified that his mental health issues caused him to "constantly get to[o] nervous and paranoid," and that he was "always hearing these voices." (R. 42.) He explained that he had trouble trusting others and was "always looking over [his] back." (*Id.*) As for his physical health, plaintiff testified that he could hardly stand due to his left knee, which began to tighten up on him after "maybe 30 seconds" of standing, at which point he had to sit down. (*Id.*) This made it difficult to work at the barbershop, and as a result, he spent most of his time there sitting down. (R. 43.) Plaintiff specifically denied that he cut hair at the barbershop. (R. 44.)

---

[5] During a group therapy session at CT Renaissance on August 7, 2020, plaintiff stated that he was "doing odd jobs like cutting people's hair to make extra money." (R. 1038.)

The ALJ then inquired about plaintiff's mental health treatment. (R. 44.) Plaintiff testified that he took medications for his paranoia and auditory hallucinations. (*Id.*) One was for "sleeping," which didn't work ("I sleep like maybe an hour . . . and then I'm up"), and another was for PTSD and paranoia. (R. 45.) Despite that medication, he was still hearing voices "from time to time," whenever the medication "wears off," which is also when the "paranoia kicks in, everything kicks in." (R. 46.) Plaintiff testified that he had returned to his providers to increase the dosage, and that Dr. Guerrera had "boost[ed] the dosage," but reported that it still "wears off too fast," typically by the middle of the day. (R. 46.) Plaintiff explained that he sleeps in the middle of the day because he cannot sleep at night. (R. 50.)

With regard to his left knee, plaintiff testified that he did not go forward with surgical treatment because he was "overweight." (R. 50-51.) He was referred to a bariatric doctor, but "then COVID came in and it slowed everything down." (R. 51.)

At the time of the hearing, plaintiff was living in a shelter. (R. 51.) The shelter prepared meals, but he cleaned his own room and did his own laundry. (R. 51-52.) To get to his appointments, plaintiff either took public transportation or had a friend drive him. (R. 52, 58.)

On questioning by his own attorney, plaintiff testified that the time he spent at the barbershop was mostly "shooting the breeze," but that he also "needed some type of money . . . to provide for [himself]," so he also cleaned up, but once he was done cleaning, he "was just hanging around." (R. 52-53.)

Plaintiff then testified that he often has days where he can't get out of bed at all because of his depression, and when that happens, his "mind goes off." (R. 58.) On those days, he testified, he "probably stay[s] in the room [at the shelter] all day, listen[ing] to nothing, doing nothing, just lying there and thinking." (R. 58.)

15

During the hearing, plaintiff was questioned by the ALJ – and then by his own attorney – about whether he had applied for and received unemployment compensation, which would have required him to certify that he was "able to work." (R. 41.) Plaintiff initially said he was collecting unemployment (*id.*), but denied filling out "any type of application," explaining that he "had someone send that out for me," and didn't know "what they put." (R. 41-42.) Later, under questioning by his own attorney, plaintiff said that the only thing he received was "the stimulus check" for $1,200 (R. 53), presumably referring to the COVID-related Economic Impact Payments issued by the Internal Revenue Service in 2020. At that point, the ALJ interrupted to note that "unemployment is reporting that they've been paying, giving to him [sic] money now for a couple of months now," adding up to "a little over $6,000 since the third quarter." (R. 54.) When the ALJ recited the address to which the unemployment checks were going, plaintiff testified that it was his "old apartment," and that his aunt, with whom he previously lived, "said she received something and she sent it back." (R. 55.) After further questioning, plaintiff conceded that he had "a card," and that "they're adding money to it" (R. 56), which according to the ALJ was "unemployment." (*Id.*) Plaintiff's counsel then confirmed, through further questions, that plaintiff had not received a paycheck with taxes deducted since before his most recent incarceration, that is, for "the last 11 or 12 years." (R. 57.)

### B.    VE Testimony

As there was no past work for the VE to consider, the ALJ asked, in his first and only hypothetical, whether there would be any jobs in the national economy for a person with plaintiff's age, education, and work experience, who is limited to sedentary work,[6] and who also:

---

[6] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying

cannot work on ladders, ropes, or scaffolds; they can occasionally use ramps, but not stairs; they can occasionally balance, stoop and crouch, but not crawl or [INAUDIBLE]; they cannot work on unprotected heights, or around dangerous machinery; they are required to use a one-handed cane for ambulation; and they are limited to simple routine work that's not done on a [production rate basis]; they can interact with, and react appropriately with supervisors, coworkers and the general public on an occasional basis[.]

(R. 60.) VE Atkinson testified that such an individual could be employed as a document preparer, DOT 249.587-018, which is sedentary work with an SVP level of 2, of which there are 15,450 positions in the national economy. (R. 60-61.)[7] Such an individual could also be employed as an addresser, DOT 209.587-010, which is sedentary work with an SVP of 2, and of which there are 2,668 positions in the national economy. (R. 61.) Lastly, such an individual could be a cutter and paster, DOT 249.587-014, which is also sedentary work with an SVP if 2, of which there are 11,742 positions in the national economy. (*Id.*)

The ALJ then asked about the maximum "off task" allowance for a person working in full-time competitive employment (outside of "a 30 meal break in the middle of their shift and two 15-minute breaks, one before and one after the meal"). (R. 61.) The VE testified that employer generally will not tolerate time off-task above "10% of the workday, in addition to normal breaks,

---

out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

[7] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job . . . SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job." *Garcia v. Comm'r of Soc. Sec.*, 2022 WL 4234555, at *9 n.18 (S.D.N.Y. Sept. 14, 2022) (quoting *Urena-Perez v. Astrue*, 2009 WL 1726217, at *20 (S.D.N.Y. Jan. 6, 2009), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. June 18, 2009)), *amended in part on other grounds*, 2022 WL 17103621 (S.D.N.Y. Nov. 22, 2022). The Dictionary of Occupational Titles (DOT), published by the U.S. Department of Labor from 1938 to 1999, includes SVP ratings for each occupation listed therein. *See* SSR 82-41, 1982 WL 31389, at *2 (S.S.A. 1982). SVPs 1 and 2 correspond to "unskilled work," which is "work which needs little or no judgment to do" and involves "simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 416.968(a).

or about six minutes per hour[.]" (*Id.*) Asked about attendance, the VE responded that the limit would be "no more than one unscheduled absence per month on the average, and that would include days of being significantly late, or leaving early on the unscheduled days." (*Id.*)

Plaintiff's counsel asked the VE whether, based on plaintiff's "description of his work where he would hang out in the barbershop and occasionally clean," where "someone was being supportive of him, letting him hang out and letting him fill-in," that prior employment was considered competitive, to which the ALJ responded in the negative. (R. 62.) Plaintiff's counsel also asked what was involved in the "cutter and paster" position, and the VE explained that it involved "copying and pasting from one computer site to another." (*Id.*) When asked whether "using the computer [would] still be SVP 2," the VE answered that "it's a fairly simple program that could be taught typically within 30 days." (*Id.*)

## IV.    THE ALJ'S DECISION

On May 19, 2021, the ALJ issued the Decision, concluding that plaintiff was not disabled. At step one of the five-step analysis mandated by 20 C.F.R. § 416.920(a)(4)(i)-(v), the ALJ found that plaintiff had not engaged in substantial gainful activity since August 30, 2019, the date on which he applied for SSI. (R. 13.) At step two, *see* 20 C.F.R. § 416.920(a)(4)(ii), he found that plaintiff's degenerative joint disease and meniscus tear left knee, obesity, asthma, schizoaffective disorder bipolar type, depressive disorder, and PTSD were all "severe" impairments. (*Id.*)

At step three, *see* 20 C.F.R. § 416.920(a)(4)(iii), the ALJ found that none of plaintiff's severe medical impairments, individually or in combination, met or equaled the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-16.) The ALJ considered Listing 1.08 (Abnormality of a major joint), Listing 3.03 (Asthma), Listing 12.03 (Schizophrenia spectrum and other psychotic disorders), Listing 12.04 (Depressive, bipolar and related disorders), and Listing 12.15 (Trauma- and stressor-related disorders). (*Id.*) The ALJ also considered SSR 19-

2p, 2019 WL 2374244 (S.S.A. May 20, 2019), regarding obesity, and found that plaintiff's medical impairments, in combination with his obesity, do not meet or equal a listing, and further that his "obesity, by itself, is not medically equivalent to a listing." (R. 14.)

With respect to plaintiff's mental impairments, the ALJ explained that they do not meet or medically equal the criteria for Listings 12.03, 12.04, or 12.15 because, among other things, the relevant "paragraph B" criteria are not satisfied. (R. 15.) "To satisfy the 'paragraph B' criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning." (*Id.*) After considering the medical evidence, the ALJ concluded that plaintiff had a mild limitation in understanding, remembering or applying information, and a moderate limitation in the other three functional areas: interacting with others; concentrating, persisting or maintaining pace; and adapting and managing himself. (R. 15-16.)

Plaintiff does not challenge the ALJ's findings at steps one through three.

Before proceeding to step four, the ALJ found that plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. § 416.967(a), except that he:

> cannot climb ladders/ropes/scaffolds or stairs, crawl, or kneel; occasionally climb ramps, balance, stoop, and crouch; he cannot work at unprotected heights or around dangerous machinery and should avoid exposure to excessive pulmonary irritants such as heat, humidity, cold, dust, fumes or odors, but would be able to work in an environment that one would typically expect in an office setting; and he requires the use of a one-handed cane for ambulation. In addition, claimant is limited to simple routine work that is not done at a production rate pace and can occasionally interact with and react appropriately with supervisors, coworkers and the general public.

(R. 17.)[8] As discussed in more detail in Part V.E, *infra*, one of the limitations in the RFC – that plaintiff "should avoid exposure to excessive pulmonary irritants such as heat, humidity, cold,

---

[8] An ALJ's reference to work done at a production rate pace generally means "assembly line work." *Rivera v. Comm'r of Soc. Sec.*, 2022 WL 4482374, at *2 (S.D.N.Y. Sept. 27, 2022).

dust, fumes or odors, but would be able to work in an environment that one would typically expect in an office setting" – was never presented to the VE as part of any hypothetical.

In formulating plaintiff's RFC, the ALJ found that his statements about the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent" with other evidence in the record (R. 18), pointing out, for example, that although he has "mental impairments including schizoaffective disorder and PTSD with breakthrough auditory hallucinations, irritability, and difficulty focusing and remembering, as well as some social withdrawal," he has been compliant with mental health treatment and has had no difficulty attending medical appointments. (R. 21.) Moreover, according to the ALJ, plaintiff's "reported activities of daily living likewise indicate that he is functioning well on a day-to-day basis." (*Id.*) The ALJ noted that plaintiff is independent in hygiene and grooming; cleans his own room in the shelter; does laundry and dishes without assistance; shops; watches television and movies; goes to the library on a regular basis; and although he does not drive, can walk and take public transportation. (*Id.*)

Turning to the opinion evidence, the ALJ noted that Dr. Chapman largely agreed with Dr. Blackwell, except that Dr. Blackwell found that plaintiff had a "moderate" limitation in his ability to adapt or manage himself, while Dr. Chapman found that he had "no limitations" in this functional area. (R. 21.) The ALJ concluded that "Dr. Blackwell's opinion is more persuasive" on this point, because the medical records reflected that plaintiff had "poor judgment and insight as well as auditory hallucinations that support a moderate limitation." (*Id.*) The ALJ found Dr. Fiskus's opinion "somewhat persuasive," except that, in the ALJ's view, his finding that plaintiff had "marked" limitations in his ability to regulate emotions, control behavior, and maintain well-being was "not entirely supported." (R. 22.) The ALJ explained that although plaintiff "does have intermittent auditory hallucinations and poor insight and judgment," he is also "able to attend

medical appointments and take public transportation, maintain his grooming and appearance, and maintain his living space." (*Id.*)

As to the remaining opinion evidence, the ALJ found the opinions of Drs. Padmaraju and Vinluan "generally persuasive" and consistent with each other, and generally consistent with Dr. Nickens' opinion. (R. 21-22.) Dr. Nickens' opinion was "somewhat persuasive," given her "limited examination findings." (R. 22.)

At step four, *see* 20 C.F.R. § 416.920(a)(4)(iv), the ALJ determined that plaintiff had no past relevant work. (R. 23.)

Finally, at step five, *see* 20 C.F.R. § 416.920(a)(4)(v), the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (R. 23.) Citing the testimony of VE Atkinson, the ALJ found that plaintiff could be employed as a document preparer, addresser, or cutter and paster. (R. 24.) The ALJ therefore concluded that plaintiff was not disabled, as defined in the Act, from August 30, 2019, through May 19, 2021, the date of the Decision. (*Id.*)

## V.    ANALYSIS

In considering the parties' motions, I have reviewed the entire administrative record (totaling 1,192 pages) and applied the familiar and frequently reiterated standards used by federal district courts to review decisions of the Commissioner.

A court may set aside an ALJ's decision only if it is based upon legal error or if the ALJ's factual findings are not supported by substantial evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at *11-12 (S.D.N.Y. Mar. 12, 2019). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by

substantial evidence." *Ulloa v. Colvin*, 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada*, 167 F.3d at 773).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides," *Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009) (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999); *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)); however, "the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation." *Dubois v. Comm'r of Soc. Sec.*, 2022 WL 845751, at *4 (S.D.N.Y. Mar. 21, 2022). "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks omitted).

Although the substantial evidence standard is "a very deferential standard of review," *Brault*, 683 F.3d at 448, "the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the [ALJ's] determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Thus, where the ALJ fails to provide an adequate "roadmap" for his reasoning, remand may be appropriate. *See*, *e.g.*, *Toni I. v. Comm'r of Soc. Sec.*, 2022 WL 3152588, at *4 (S.D.N.Y. Aug. 7, 2022) (an ALJ's failure to provide "an adequate 'roadmap' . . . deprives the Court of the ability to determine accurately whether the ALJ's opinion is supported by substantial evidence"). Where the ALJ

adequately explains his reasoning, however, and where his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner").

In this case, plaintiff argues principally: (1) that the ALJ failed to properly evaluate the psychiatric opinion evidence, *see* Pl. Mem. at 13-19; (2) that the RFC was inconsistent with the ALJ's "paragraph B" findings as to plaintiff's "moderate" limitations, *see id.* at 19-20; (3) that the ALJ failed to consider whether plaintiff's impairments would result in excessive absences or time off-task, *see id.* at 20-21; Pl. Reply Mem. at 1-3; (4) that the ALJ failed to properly credit plaintiff's subjective statements, Pl. Mem. at 21-23; and (5) that the ALJ erred in relying on the VE's hearing testimony after adding a new limitation to plaintiff's RFC, as to which the VE never opined. *Id.* at 23-25. The Commissioner argues that substantial evidence in the record supports all of the ALJ's determinations, including his evaluation of the expert medical evidence and plaintiff's subjective statements; that the RFC need not "mirror" his step three findings as to the "paragraph B" criteria; and that the hypothetical given to the VE was not "insufficient." Def. Mem. at 10-22.

I agree with the Commissioner as to plaintiff's first, second, and fourth challenges. However, as explained below, I conclude that the ALJ erred in failing to consider whether a claimant with a long history of auditory hallucinations and insomnia, both only partially controlled by medication, would be able to stay on-task for 90% of a 40-hour workweek at a sedentary job,

and be late or absent no more than once a month. I further conclude that it was error for the ALJ to apply the VE's opinion, based upon a precise hypothetical, to an RFC that included a new limitation that was not part of that hypothetical.

### A.    The ALJ Properly Evaluated the Opinion Evidence

In plaintiff's view, the ALJ's analysis of the expert opinion evidence was impermissibly "vague," in that he found Dr. Blackwell's opinion "more persuasive" than Dr. Chapman's, and characterized Dr. Fiskus's opinion as "somewhat persuasive," thus leaving it "unclear" how much deference he gave to each opinion. Pl. Mem. at 15. Plaintiff further argues that the ALJ improperly discounted Dr. Fiskus's report (rejecting his opinion that plaintiff had "marked" limitations in regulating emotion, controlling behavior, and maintaining well-being) by "cherry-picking" the record. *Id.* at 16-18. I disagree on both points.

The regulations governing plaintiff's application specify that an ALJ need not "defer" or "give any specific evidentiary weight, including controlling weight," to any medical opinion or prior administrative medical finding. 20 C.F.R. § 416.920c(a). Rather, the ALJ must evaluate the "persuasiveness" of each opinion or finding in light of: (i) its "[s]upportability"; (ii) its "[c]onsistency"; (iii) the "[r]elationship" between the medical source and the claimant; (iv) the source's "[s]pecialization" in a relevant medical field; and (v) "other factors that tend to support or contradict" the opinion or finding. *Id.* § 416.920c(c)(1)-(5). The most important factors are "supportability" and "consistency." *Id.* § 416.920c(b)(2); *Rivera v. Comm'r of the Soc. Sec. Admin.*, 2020 WL 8167136, at *11 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted sub nom. Rivera v. Comm'r of Soc. Sec. Admin.*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021). The ALJ need not discuss all of the factors described in the regulations, but must, as to each opinion or prior administrative medical finding, "explain how [he or she] considered the supportability and consistency factors." *Id.* § 416.920c(b)(2).

24

It is well-settled that, when evaluating expert evidence, "[a]n ALJ may accept parts of a doctor's opinion and reject others." *Camille v. Colvin*, 652 Fed. App'x 25, 29 n.5 (2d Cir. 2016) (summary order); *see also Gutierrez v. Comm'r of Soc. Sec.*, 2022 WL 2116718, at *12 (S.D.N.Y. June 13, 2022) ("an ALJ is not required to take the opinion of an opining physician wholesale and can rely on parts of it, as long as the RFC is supported by substantial evidence"). Thus, it is "entirely within the ALJ's purview to find an opinion partially persuasive." *Garcia v. Kijakazi*, 2022 WL 3442314, at *18 (S.D.N.Y. Aug. 11, 2022) (ALJ who found one opinion "partially" persuasive and another opinion "somewhat" persuasive "did not err in evaluating the medical source opinions"), *report and recommendation adopted sub nom. Garcia v. Comm'r of Soc. Sec.*, 2022 WL 3903182 (S.D.N.Y. Aug. 30, 2022); *see also Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *10 (S.D.N.Y. Oct. 21, 2021) (upholding Commissioner's decision where "the ALJ explained why she found the opinion of Dr. Salon to be only somewhat persuasive"); *Napolitano v. Kijakazi*, 2023 WL 3185511, at *12 (S.D.N.Y. May 2, 2023) (upholding where ALJ properly found Dr. Michell's opinions "generally persuasive" and Dr. Putcha's opinion "partially persuasive"). As long as the ALJ adequately identifies which parts of the opinion he is accepting, and which parts he is rejecting, there is nothing vague or unclear about the use of terms such as "partially persuasive," "generally persuasive," or – as here – "somewhat persuasive." *See also* 20 C.F.R. § 416.920c(b) (explaining that the ALJ will articulate "how persuasive" he finds all of the medical opinions and prior administrative medical findings in a claimant's case record").

By the same token, it is entirely appropriate for an ALJ to state which of two inconsistent opinions he finds "more persuasive." *See*, *e.g.*, *Ruiz v. Comm'r of Soc. Sec.*, 625 F. Supp. 3d 258, 267 (S.D.N.Y. 2022) (upholding Commissioner's decision where ALJ properly found Dr. Kushner's opinion "more persuasive than Dr. Cohen's opinion"); *Kostick v. Kijakazi*, 2022 WL

4364771, at *8 (S.D.N.Y. Sept. 21, 2022) (upholding where "the ALJ appropriately found Dr. Uppal's opinion more persuasive than Dr. Saeed's"). *See also* 20 C.F.R. § 416.920c(c)(1)-(2) (explaining that the more supportable an opinion is, and the more consistent with other record evidence, the "more persuasive" it will be).

Here, the ALJ properly evaluated all of the relevant medical opinions and findings, identified the portions of Dr. Chapman's and Dr. Fiskus's opinions he declined to accept, and explained why. The ALJ permissibly rejected Dr. Chapman's opinion that plaintiff has "no limitations" in adapting or managing himself, because the record contains substantial evidence that he has "poor judgment and insight as well as auditory hallucinations." (R. 21.) Similarly, the ALJ permissibly rejected Dr. Fiskus's opinion that plaintiff has "marked" limitations in the same functional area, because – despite his problems with judgment, insight, and hallucinations – he is able to manage himself well enough to attend his medical appointments, take public transportation, maintain grooming, and take care of his living space. (R. 22 (citing R. 291-97, 304-19, 371-75, 1016-51, 1075-108).)

Plaintiff takes issue with this analysis, arguing, in effect, that the ALJ was *required* to accept Dr. Fiskus's opinion that plaintiff had "marked" limitations in regulating emotions, controlling behavior, and maintaining well-being. Pl. Mem. at 16-18. In support of this argument, plaintiff scours the record for evidence that would support a greater degree of limitation than the ALJ found, offering his obesity (which he characterizes as an "indication that [he] is [not] able to adequately maintain his grooming and appearance," *id.* at 17), his criminal and prison record (including the 2018 incident when he "had to be subdued by prison guards," *id.*), and his failure to wait in the Bridgeport Hospital ER until he was called for an X-ray. *Id.* Obesity, however, is a medical impairment, not a grooming problem. And while plaintiff's criminal conduct – most of it

committed when he was a much younger man – no doubt owed much to his "difficulty with managing anger," *id.*, none of the incidents that he cites, singly or in combination, compels the conclusion that since his release from prison he has had "marked," as opposed to "moderate," limitations in this functional area. At bottom, plaintiff's "disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it" at his request. *Krull v. Colvin*, 669 Fed. App'x 31, 32 (2d Cir. 2016) (summary order).

### B. The ALJ'S RFC Formulation Is Not Inherently Inconsistent with His "Paragraph B" Analysis

Plaintiff next argues that the ALJ's RFC is inconsistent with his step three findings concerning the "paragraph B" criteria. Pl. Mem. at 19-20. Specially, plaintiff contends that the RFC "does not accommodate" his moderate limitation in concentrating, persisting, and maintaining pace. Pl. Mem. at 19. Similarly, plaintiff asserts that "there are no limitations in the RFC that support" the ALJ's prior finding that plaintiff had moderate limitations in adapting and managing himself. *Id.* at 16.

The Commissioner responds that "[t]he 'special technique' applied by the ALJ at step three is distinct from the RFC determination." *See* Def. Mem. at 15 (citing *Whipple v. Astrue*, 479 F. App'x 367, 369 (2d Cir. 2012) (summary order)). Thus, the Commissioner argues, the ALJ "may take the same information finding a moderate limitation for 'paragraph B' criteria and conclude that Plaintiff's functional capacity is not impaired by that moderate limitation." *Id.* at 15-16 (quoting *Moss v. Comm'r of Soc. Sec.*, 2022 WL 4365349, at *16 (S.D.N.Y. Sept. 20, 2022)). Similarly, the Commissioner argues that the ALJ's step three finding that plaintiff had a moderate limitation adapting and managing himself was "distinct from and otherwise did not require a particular RFC determination or VE hypothetical." Def. Mem. at 20. In this case, however, the ALJ did *not* conclude that plaintiff's functional capacity was "not impaired" by his moderate mental

limitations. Instead, after accepting all or most of the opinions of Drs. Fiskus, Blackwell, and Chapman, the ALJ concluded that plaintiff's functional capacity was limited to "simple routine work that is not done at a production rate pace and can occasionally interact with and react appropriately with supervisors, coworkers and the general public." (R. 17.)

Both parties rely on *McIntyre v. Colvin*, 758 F.3d 146 (2d Cir. 2014). However, that case arose in an unusual posture not present here. In *McIntyre*, the ALJ found at step three that the plaintiff had "moderate difficulties" in two functional areas – maintaining social functioning and maintaining concentration, persistence, and pace – but formulated an RFC that included only exertional and postural restrictions. *See* 758 F.3d at 149 & n.1. On appeal, the Second Circuit held that the ALJ erred in formulating an RFC with no restrictions at all corresponding to the plaintiff's moderate mental limitations, but that the error was harmless, because the ALJ had given the VE a narrower hypothetical, which *included* a restriction to "simple, routine, low stress tasks[.]" *Id.* at 152. Since the medical evidence demonstrated that plaintiff could engage in such tasks, and since all three of the jobs identified by the VE ("table worker," "patcher," and "stuffer," *see id.* at 149 n.2) conformed to the hypothetical, no remand was required. *Id.* at 152.

In the case at bar, both the hypothetical to the VE *and* the RFC formulated by the ALJ included explicit restrictions designed to account for plaintiff's mental impairments. Not only was plaintiff restricted to "simple routine" work; that work was "not [to be] done at a production rate pace," and plaintiff would only "occasionally interact with and react appropriately with supervisors, coworkers and the general public." (*See* R. 60 (hypothetical to VE); R. 17 (RFC)). The question for this Court, then, is whether restrictions of this type can adequately account for moderate limitations in concentration, persistence, and pace, and adapting and managing oneself.

I answer that question in the affirmative, as did the Second Circuit, *see McIntyre*, 758 F.3d at 152 (restriction to "simple, routine, low stress tasks" sufficiently accounted for plaintiff's moderate limitations in maintaining concentration, persistence, and pace), and many other courts in our Circuit. *See*, *e.g.*, *John B. v. Kijakazi*, 2023 WL 24046, at *1 (W.D.N.Y. Jan. 3, 2023) (limiting plaintiff to "simple, routine, repetitive tasks that do not require a production rate pace," "simple work-related decisions," and only occasional interaction with supervisors, coworkers, and the public adequately accounted for plaintiff's "moderate" limitations in all four functional areas, including "maintaining concentration, persistence, and pace" and "adapting or managing himself"); *Moss*, 2022 WL 4365349, at *17 (limiting plaintiff to "simple, routine work at a low-stress job" "sufficiently accounted for [his] moderate limitation in concentrating, persisting or maintaining pace"); *Garcia*, 2022 WL 3442314, at *19 (restricting Garcia to "simple and routine tasks with no production rate pace" accounted for her "marked limitations in 'understanding, remembering, or applying information,' mild-to-moderate intellectual disability based on her IQ scores, and moderate limitations on pace," while restriction to "only occasionally interacting and reacting in an appropriate manner with supervisors and co-workers" accounted for her "moderate limitations in the areas of interacting with others and adapting or managing oneself").[9] Consequently, I reject

---

[9] *See also Theresa G. v. Saul*, 2021 WL 1535472, at *3 (N.D.N.Y. Apr. 19, 2021) (plaintiff's "moderate limitation in adapting and managing oneself" was adequately accounted for in RFC restricting plaintiff to "a low level of work pressure, defined as work not requiring multitasking or a high production-rate pace"), *reconsideration denied*, 2021 WL 2282024 (N.D.N.Y. June 4, 2021); *Ana H. v. Comm'r of Soc. Sec.*, 2020 WL 6875252, at *10 (W.D.N.Y. Nov. 23, 2020) ("the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence, and pace by limiting her to simple, routine, and repetitive tasks and simple work-related decisions"); *Brierley v. Saul*, 2020 WL 709609, at *6 (W.D.N.Y. Feb. 12, 2020) (rejecting plaintiff's contention that "limiting [plaintiff] to 'simple, routine tasks' in the RFC 'did not adequately account for' her moderate limitations in concentration, persistence and pace"); *Katherine Marie S. v. Comm'r of Soc. Sec.*, 2019 WL 1427456, at *9 (N.D.N.Y. Mar. 29, 2019) ("[C]ourts [in the Second Circuit] have routinely held that individuals suffering from 'moderate' difficulties with memory,

plaintiff's contention that the RFC formulated by the ALJ "does not accommodate" plaintiff's moderate mental limitations.

### C.   The ALJ Adequately Evaluated Plaintiff's Subjective Statements

The ALJ is required to "consider" the claimant's subjective reports of pain and other symptoms, 20 C.F.R. § 416.929(a), but is not required to accept them "without question." *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 736 (S.D.N.Y. 2018). When considering the "intensity and persistence" of the claimant's symptoms, the ALJ must consider "all of the available evidence," both medical and non-medical. 20 C.F.R. § 416.929(c).[10]

As with any finding of fact, an ALJ's assessment of a claimant's subjective complaints is entitled to substantial deference by the reviewing court. *Rivera v. Berryhill*, 2018 WL 4328203, at *10 (S.D.N.Y. Sept. 11, 2018) (citing *Osorio v. Barnhart*, 2006 WL 1464193, at *6 (S.D.N.Y.

---

concentration, and handling stress could reasonably be found to have the residual functional capacity to perform 'simple, routine and repetitive tasks.'") (quoting *Worthy v. Berryhill*, 2017 WL 1138128, at *7 (D. Conn. Mar. 27, 2017), and collecting cases) (modification in original). *Cf. Matos v. Comm'r of Soc. Sec.*, 2022 WL 3084512, at *10 (S.D.N.Y. June 16, 2022) (RFC restricting plaintiff to "'simple, routine tasks not done at a production rate pace,' occasional interaction with and appropriate reaction to supervisors and coworkers, and 'no more than superficial interactions with the general public'" did not adequately account for plaintiff's "moderate" limitations in maintaining concentration, persistence, and pace, because while RFC addressed pace, it did not include "any explicit limitations in concentration and persistence"), *report and recommendation adopted*, 2022 WL 3084404 (S.D.N.Y. Aug. 3, 2022).

[10] Factors relevant to evaluating a claimant's reported symptoms include:

> (i) [His] daily activities; (ii) The location, duration, frequency, and intensity of [his] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [he] take[s] or [has] taken to alleviate [his] pain or other symptoms; (v) Treatment, other than medication, [he] receive[s] or [has] received for relief of [his] pain or other symptoms; (vi) Any measures [he] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning [his] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

May 30, 2006)). Thus, a court may not "second-guess" the ALJ's decision to discount a claimant's statements about his symptoms "where the ALJ identified specific record-based reasons for his ruling," *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010), and where his determination is supported by substantial evidence. *Valdez v. Colvin*, 232 F. Supp. 3d 543, 553 (S.D.N.Y. 2017) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013)).

Plaintiff is correct that where an ALJ discredits the claimant's testimony, even in part, the basis for the finding must be "set forth with sufficient specificity to permit intelligible plenary review of the record." *Agapito v. Colvin*, 2014 WL 774689, at *3 (S.D.N.Y. Feb. 20, 2014) (quoting *Williams*, 859 F.2d at 260-61). However, the ALJ "is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as the evidence of record permits the court to glean the rationale of an ALJ's decision." *Morgan v. Comm'r of Soc. Sec.*, 2022 WL 3044861, at *15 (S.D.N.Y. July 8, 2022) (quoting *Morales v. Berryhill*, 484 F. Supp. 3d 130, 151 (S.D.N.Y. 2020)), *report and recommendation adopted sub nom. Morgan v. Kijakazi*, 2022 WL 3044576 (S.D.N.Y. Aug. 2, 2022); *see also Lane v. Saul*, 2020 WL 3965257, at *9 (S.D.N.Y. Mar. 16, 2020) ("listing each of the seven factors [set forth in 20 C.F.R. § 416.929(c)(3)] is not necessary where the decision shows the ALJ evaluated Plaintiff's credibility by considering all of the relevant evidence"), *report and recommendation adopted*, 2020 WL 1876325 (S.D.N.Y. Apr. 15, 2020).

Even where the ALJ has committed legal error in his evaluation of the plaintiff's subjective statements, that error may be disregarded as harmless where "substantial evidence supported the ALJ's overall credibility determination." *Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) (summary order); *accord Snyder v. Colvin*, 667 F. App'x 319, 320 (2d Cir. 2016) (summary order) (remand was not required, despite legal error, because "the credibility determination was supported

by other substantial record evidence"); *Kuchenmeister v. Berryhill*, 2018 WL 526547, at *19 (S.D.N.Y. Jan. 19, 2018) (ALJ's error when determining plaintiff's credibility was harmless because the ALJ's "overall determination to discount plaintiff's subjective complaints is supported by substantial evidence"). Additionally, errors in assessing a claimant's credibility will be deemed harmless where "the ALJ did not discredit any material portions of Plaintiff's testimony." *Cillari v. Colvin*, 2015 WL 1433371, at *20 (S.D.N.Y. Mar. 30, 2015) (affirming Commissioner's denial of benefits even though the ALJ's credibility assessment was "brief and rather opaque").

Here, plaintiff argues that the ALJ's "meager" evaluation of plaintiff's allegations was "insufficient," in that the ALJ "failed to conduct any detailed analysis" before "making the boilerplate conclusion" that plaintiff's allegations were "not entirely consistent with the medical evidence and other evidence in the record." Pl. Mem. at 22 (quoting R. 18). Not so. The ALJ carefully described plaintiff's allegations concerning his symptoms, drawing on both his hearing testimony (summarized above) and his Function Report, in which plaintiff wrote (among other things) that he did not go out often due to paranoia; that there are days when he did not get out of bed at all; that he avoided socializing; and that even sitting was uncomfortable. (R. 17-21.) The ALJ then supported his conclusion that plaintiff's statements were not "entirely consistent" with the record evidence (R. 18) with a detailed discussion of that evidence, including plaintiff's consistently normal or near-normal mental status examinations at Recovery Network and CT Renaissance; his compliance with treatment and consistent attendance at medical appointments; and his activities of daily living, including cleaning, laundry, doing dishes, taking public transportation, and going to the library, all of which, in the ALJ's view, indicated that,

notwithstanding his mental impairments, including "breakthrough auditory hallucinations" (which the ALJ credited), plaintiff was "functioning well on a day to day basis." (R. 21.)[11]

Because the ALJ appropriately relied on both medical and non-medical evidence to assess the intensity and persistence of plaintiff's symptoms, and "identified specific record-based reasons for his ruling," *Stanton*, 370 F. App'x at 234, his credibility determination is "entitled to deference." *Valdez*, 232 F. Supp. 3d at 553 (quoting *Selian*, 708 F.3d at 420).

### D.     The ALJ Erred in Failing to Clarify or Consider Plaintiff's Likely Absences and Time Off-Task

Failure to address whether a claimant would incur excessive absences from work, or excessive off-task time, can constitute legal error requiring remand. *See, e.g.*, *Rivera*, 2022 WL 4482374, at *2-4. The law does not require (and I do not understand plaintiff to argue) that the ALJ must expressly analyze this issue whenever a VE testifies to a maximum tolerable absentee rate or off-task allowance, or whenever a claimant has "moderate" limitations in a broad functional area such as sustaining concentration, performance, and pace. In many cases, those limitations may be accounted for by restricting the plaintiff to simple, routine work and/or work not done at a production rate pace. *See* Part V.B, *supra*.

In this case, however, the record contains extensive and consistent evidence that plaintiff's long-standing symptoms included insomnia, which was not controlled by medication and caused

---

[11] Although the ALJ did not specifically discuss plaintiff's barbershop job in connection with his evaluation of plaintiff's subjective symptoms, the fact that plaintiff spent 12 hours a day at the shop, three days a week, over a period of months, during which he occasionally did "odd jobs like sweeping," but due to his knee was "sitting down most of the day," "just shooting the breeze," (R. 39-41, 43, 52), also tends to undercut plaintiff's claims that he did not go out often, avoided socializing, and was uncomfortable sitting. *See DuBois*, 2022 WL 845751, at *7 (plaintiff's daily activities, including "visiting her husband's pet store 'to help out as needed' and socialize," undermined her contention that the ALJ erred by failing to include a "social contact limitation" in her RFC).

him to sleep during the day (*see* R. 50, 291, 326-27 1033, 1045), and auditory hallucinations, only partly controlled by medication. (*See* R. 46, 48-50, 1079.) The ALJ credited these symptoms, finding that plaintiff's mental impairments include "breakthrough auditory hallucinations, . . . and difficulty focusing and remembering." (R. 21.) Additionally, the ALJ credited the opinion of Dr. Blackwell, who found that plaintiff was moderately limited in the "ability to maintain attention and concentration for extended periods" and the "ability to work in coordination with or in proximity to others without being distracted by them" (R. 85); the opinion of Dr. Chapman, who found that he was moderately limited in the "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance" (R. 101); and the opinion of *both* state agency psychiatric reviewers, who agreed that plaintiff was moderately limited in the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 85, 101.) Moreover, although VE Atkinson testified that an employer generally will not tolerate time off-task above "10% of the workday, in addition to normal breaks" (R. 61), or more than "one unscheduled absence per month on the average" (including "days of being significantly late, or leaving early") (*id.*), the ALJ nowhere discussed his implicit conclusion that plaintiff could meet these standards if given "simple routine work that is not done at a production rate pace" and involved only occasional interactions with others. (R. 17.)

In *Rivera*, on similar facts, the court remanded for further consideration of whether plaintiff could meet the 5% off-task limit and one-day-per-month unscheduled absence limit testified to by the VE. 2022 WL 4482374, at *3-4. Remand was necessary, the court explained, because the record contained medical opinion evidence specifically raising this issue, including consultative examiner Dr. Juriga's opinion that plaintiff had "moderate" limitations in "completing a workday

without interruptions from psychologically based symptoms, maintaining regular attendance, and performing at a consistent rate without an unreasonable number and length of rest periods," and in "being punctual within customary tolerances," but Dr. Juriga did not "quantify" the effect of these limitations "and seemingly was not asked to do so." *Id.* at *2-3. Consequently, even though the RFC formulated by the ALJ restricted plaintiff to "simple, routine tasks that are not at a product [sic] rate pace (e.g., assembly line work)," the court remanded for further development of the record as to "off-task/absence limitations." *Id.* at *3-4.[12]

As noted above, an ALJ must provide an adequate "roadmap'" for his reasoning. "The failure to do so deprives the Court of the ability to determine accurately whether the ALJ's opinion is supported by substantial evidence." *Toni I.*, 2022 WL 3152588, at *4 (citing *Ferraris*, 728 F.2d at 587); *accord Moscatello v. Saul*, 2019 WL 4673432, at *10 (S.D.N.Y. Sept. 25, 2019) ("[R]emand may be appropriate if the ALJ fails to provide an adequate 'roadmap' for his reasoning."); *Prieto v. Comm'r of Soc. Sec.*, 2021 WL 3475625, at *15 (S.D.N.Y. Aug. 6, 2021) ("It is the ALJ's responsibility to 'build an accurate and logical bridge from the evidence to [his] conclusion to enable meaningful review.'") (quoting *Horton v. Saul*, 2021 WL 1199874, at *12

---

[12] *See also*, *e.g.*, *Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (summary order) (remanding where the VE testified that the claimant would be limited to six minutes off-task per hour but Dr. Keller opined that he would need "regular comfort breaks" of unspecified length and Cosnyka himself testified that "it would take him 15 or 20 minutes to walk off his pain"); *Ruiz v. Comm'r of Soc. Sec.*, 2020 WL 728814, at *13 & n.22 (S.D.N.Y. Feb. 13, 2020) (remanding where ALJ implicitly found that plaintiff's fatigue would not cause her to be off-task more than 5% of the time, despite Dr. Mora-McLaughlin's opinion that plaintiff had to "rest two to four hours per day," but provided "no explanation" for his conclusion"); *Matos*, 2022 WL 3084512, at *8 (remanding where ALJ accepted medical opinion that plaintiff was moderately limited in the "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance," and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," but failed to discuss whether these limitations would prevent him from being absent from work more than once a month or off-task more than 10% of the workday, as prescribed by VE).

(S.D.N.Y. March 30, 2021)) (alteration in original). Here, as in *Rivera* (and the cases noted in the margin), the record contains substantial opinion and non-opinion evidence going directly to the question whether plaintiff is capable of meeting the attendance and on-task requirements for the competitive, full-time employment described in his RFC. The ALJ, however, did not address this issue, nor "build an accurate and logical bridge" to his implicit conclusion that plaintiff's insomnia, hallucinations, and paranoia were well-enough controlled so that he could be on-task and punctual "within customary tolerances." Remand is therefore required for further consideration of this issue.

### E.     The ALJ Erred in Relying on the VE's Response to an Incomplete Hypothetical

At step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do. 20 C.F.R. § 416.960(c)(1)-(2). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. Part 404, Subpt. P, App. 2, typically guide this evaluation, placing claimants with exertional limitations into categories according to their exertional capabilities (*e.g.*, sedentary, light, or medium work), age, education, and work experience. *See* 20 C.F.R. § 416.920(g). However, "[w]hen a claimant suffers from a nonexertional limitation such that he is 'unable to perform the full range of employment indicated by the [Grids],' . . . the Commissioner must introduce the testimony of a vocational expert in order to prove 'that jobs exist in the economy which claimant can obtain and perform.'" *Rivera v. Colvin*, 2015 WL 1027163, at *11 (S.D.N.Y. Mar. 9, 2015) (quoting *Butts v. Burnhart*, 388 F.3d 377, 383 (2d Cir. 2004)); *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)) (alteration in original).

The VE's testimony is properly elicited by means of a hypothetical question incorporating all of the capabilities and limits of the claimant seeking benefits. However, the hypothetical question must "accurately reflect the limitations and capabilities of the claimant involved."

*McIntyre*, 758 F.3d at 151 (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)). "If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Pritchard v. Colvin*, 2014 WL 3534987, at *10 (N.D.N.Y. July 17, 2014); *see also Garcia v. Colvin*, 2015 WL 5786506, at *11, 23 (S.D.N.Y. Sept. 29, 2015) (remanding due to an "incomplete hypothetical" where "each question posed by the ALJ asked the vocational expert to assume an individual who was capable of both light and sedentary work," but the ALJ ultimately "determined in his RFC analysis that Plaintiff was restricted to sedentary work and was impeded by additional limitations"); *Pardee v. Astrue*, 631 F. Supp. 2d 200, 211 (N.D.N.Y. 2009) ("A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.").

In this case, the hypothetical question posed to VE Atkinson did not include any environmental restrictions, but the RFC described in the Decision did: plaintiff "should avoid exposure to excessive pulmonary irritants such as heat, humidity, cold, dust, fumes or odors, but would be able to work in an environment that one would typically expect in an office setting." (R. 17.) Moreover, the ALJ did not recall the VE, pose a written interrogatory, or otherwise seek to update the VE's testimony to obtain assurance that the jobs identified at the hearing could still be performed by a claimant subject to the additional environmental restriction. The question for this Court, therefore, is whether that failure is harmless error, as the Commissioner contends, *see* Def. Mem. at 20-21, or requires remand, at plaintiff urges. *See* Pl. Mem. at 23-25.

The Commissioner, like the ALJ, relies on SSR 85-15, 1985 WL 56857 (S.S.A. 1985), which discusses – in fairly generally terms – when various non-exertional restrictions might be expected to erode the occupational base for a particular job. As to environmental restrictions:

> Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.
>
> Where an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions.
>
> Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a [vocational expert].

1985 WL 56857, at *8.

SSA 85-15, however, is expressly designed for claimants who have "solely a nonexertional impairment(s)," *id.* at *1, such that the "Grids" provide no guidance. Here, plaintiff has significant exertional limitations: he is restricted to sedentary work and "requires the use of a one-handed cane for ambulation." (R. 17.) In addition, he has significant postural and mental restrictions. (*Id.*) Not surprisingly, therefore, although the VE was able to identify three jobs in the national economy that plaintiff could perform (without consideration of any environmental limitation), the occupational base for each was relatively modest, ranging from 2,668 to 15,450 positions "in the national economy." (R. 60-61.) *See generally Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 231 (N.D.N.Y. 2015) (5,160 jobs nationally "is not a significant number") (collecting cases). On this record, I am not prepared to presume – in the absence of easily-available VE testimony – that each of the three jobs previously identified by VE Atkinson would still be available, in sufficient numbers, to a claimant who (in addition to the restrictions given to the VE in the hypothetical), can only work "in an environment that one would typically expect in an office

setting."[13] On remand, therefore, the ALJ should pose a complete hypothetical to the VE, including all of his exertional, postural, mental, *and* environmental restrictions.

## VI.    CONCLUSION

For the foregoing reasons, plaintiff's motion (Dkt. 21) is GRANTED, the Commissioner's motion (Dkt. 24) is DENIED, and this matter is REMANDED to the Commissioner for further proceedings consistent with the analysis above.

The Clerk of Court is respectfully directed to close the case.

Dated:  New York, New York                    **SO ORDERED.**
        September 25, 2023

**BARBARA MOSES**
**United States Magistrate Judge**

---

[13] In *Gonzalez v. Colvin*, 2016 WL 6780000 (S.D.N.Y. Nov. 16, 2016), cited by the Commissioner, *see* Def. Mem. at 21, the court held that it was harmless error for the ALJ to rely on the Grids – rather than consult a VE – where the plaintiff alleged "one non-exertional limitation," that is, asthma, and where the ALJ's RFC formulation required plaintiff's workplace to be "free of excessive amounts of respiratory irritants." *Id.* at *12, *20. In that case, however, the ALJ found that plaintiff's asthma was non-severe at step two, *id.* at *10, meaning, by definition, that it had "no more than a minimal effect on [his] ability to work." *Shand v. Kijakazi*, 2023 WL 5162994, at *12 (S.D.N.Y. Aug. 11, 2023) (quoting *Acosta v. Barnhart*, 2003 WL 1877228, at *11 (S.D.N.Y. Apr. 10, 2003)). Moreover, other than the environmental limitation, the plaintiff's RFC permitted the "full range of sedentary work." *Gonzalez*, 2016 WL 6780000, at *12. Here, by contrast, the incomplete hypothetical given to the ALJ included significant exertional and non-exertional restrictions, and plaintiff's asthma, which required two emergency room visits in 2020 (R. 1114-50, 1150-77), was "severe." (R. 13.)